**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division**

| | |
|---|---|
| **OTIS ROBERT HARRIS III**<br>**3603 Upper Union Road**<br>**Orlando, FL 32814**<br><br>      ***Plaintiff,***<br><br> v.<br><br>**NORTHRUP GRUMMAN**<br>**4733 Bethesda Avenue**<br>**Bethesda, MD 20814**<br><br>      ***Defendant.*** | **Case No. 23-657**<br><br>**Jury Trial Demand** |

## COMPLAINT

1. Plaintiff Otis Robert Harris III (hereinafter "Plaintiff Harris," "Plaintiff," or "Mr. Harris") by and through counsel, hereby files Complaint against Defendant Northrup Grumman (hereinafter "Defendant" or "Northrup Grumman"). Plaintiff seeks relief for violations of Title VII of the Civil Rights Act of 1964 as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1866, 42 U.S.C. § 1981, and seeks relief including but not limited to declaratory, injunctive, and other equitable relief compensatory and punitive damages; litigation expenses; and reasonable attorney's fees based on Defendant's discriminatory, harassing, and otherwise unlawful actions against Plaintiff Harris.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this matter contains a federal question.

1

3.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a)(1) and (b)(2), as a substantial number of the events, acts, or omissions giving rise to Mr. Harris' claims occurred in the state of Maryland.

4.      All conditions precedent to the institution of this lawsuit, including exhaustion of administrative remedy, have been fulfilled.

## PARTIES

5.      Otis Robert Harris III is an African American male and a resident of the State of Florida who was employed by Defendant Northrop Grumman from November 17, 2014 until June 19, 2020 when he was constructively discharged. At all pertinent times, Mr. Harris was an employee entitled to protection under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq*. and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

6.      Defendant Northrop Grumman is a public aerospace, weapon, and defense and military technology company who works with government contracts with various clients for various product needs. At all pertinent times, Defendant was an employer subject to provisions of under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq*. and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

## FACTS

7.      Plaintiff Harris is an electrical engineer by education and training who has worked as an electrical engineering professional since 1999. He received his Bachelor of Science degree in electrical engineering from Temple University, Philadelphia in 1999 and a Master of Science degree in electrical engineering from the University of Connecticut - New Haven in 2006.

8.      Mr. Harris has worked as an electrical engineering professional for several defense contractors which manage, design, and manufacture weapon systems and land and air-based

electronic products for the U.S. Department of Defense. He worked for General Dynamics-Electric Boat, Inc. from 1999-2004 as an electrical engineer and served as a member of the Electrical Integrated Product Team ("IPT") for wireless research telemetry applications.  He was employed with AT&T- Government Solution Inc. from 2004-2008 as a Senior Hardware Engineer where he led high precision tracking and navigation using Differential GPS ("DGPS") for Army training systems. From 2008-2012, Mr. Harris worked for PHILIPS-Medical Systems as a RF Lead Engineer and served as a technical lead for cross-functional team of production engineers and developed and manufactured wireless communication medical systems for patient care monitoring. Finally, before with the Defendant, Mr. Harris worked for Hewlett Packard from 2012-2014 as a Technical Program Manager and was responsible for the integration of wireless communication technologies across a range of HP Notebook Computers, offered technical strategies, conducted performance analyses; performed integration testing, and verified broadband communication modules to qualify for HP Notebooks' new product releases. Over the course of his extensive 24-year career, Mr. Harris has successfully registered 4 patents, Publication Nos. US20120215092 A1, Quick Re-Connect Diversity Radio System; US9356678 B2, Diverse Radio Receiver System – Impedance Matching Switch; US9331886 B2, Magnetic Field Data Modem; and WO2015080704 A1, Regulating Transmit Power of Signal Sources for Specific Absorption Rate (SAR), related to RF product development with the U.S. Patent and Trademark Office. Mr. Harris's patents allowed improvements to product performance while reducing costs and demonstrate his ability to think innovatively; ability to be a leader; and ability to take opportunities to enhance his performance and reduce risk.

9.      Mr. Harris began employment with Northrop Grumman on November 17, 2014, with a starting salary of $117,000.00. He was hired into a non-managerial position and role of

3

Integrated Program Teams ("IPT") Lead with the title of Engineer RF Microwave Design 4. As an IPT Lead, Mr. Harris' duties included day-to-day operation of Defendant's Radar Program; held a leadership role and responsibility to ensure product was delivered to customers in a timely manner as contracted; daily interface with various departments and employees to ensure timeliness and fulfillment of contracts from designing, testing, manufacturing, production, integration, assembly, and delivery; executing contract deliveries for a large radar program of receiver, exciter, and digital hardware by rapidly mitigating system failures using RF principles; tracking production status by evaluation performance metric; and providing technical expertise.

10.     Mr. Harris' supervisors were Paul Van Opens from 2014-2015; Joel A. Zonier in 2016; Vernon Diehl from 2016-2018; Steven Eason, Functional Program Manager, from 2018-2019; and David Gill from 2019-2020; all of whom, are white males.

11.     Throughout his employment, Mr. Harris consistently met or exceeded work performance expectations and had no work performance-related issues. In 2015, Mr. Harris was rated on his performance evaluation as "Exceeded Expectations." In 2016, Mr. Harris' performance evaluation indicated he "Met Expectations.".

12.     In February 2017, after approximately four years of employment as an IPT Lead, Mr. Harris' title changed from Engineer RF Microwave Design 4 to Chief Engineer 4. The change of title did not include any change in pay or promotion and Mr. Harris remained IPT Lead even with the new title of Chief Engineer. In this position, Mr. Harris was responsible for executing the product design for a silicon germanium (SiGe) microwave monolithic integrated circuit (mmic) K, L, M millimeter wave (mmw) band enhanced APR-39 radar warning receiver only system for the AH-64D Apache Platform.

13. In August 2017, approximately six months later, Mr. Harris' title was again changed from Chief Engineer 4 to Senior Principal Chief Engineer. The second change of title also did not include any change in pay or promotion and Mr. Harris remained IPT Lead even with the new title of Senior Principal Chief Engineer. In this position, Mr. Harris was responsible for executing contract deliveries for a tactical Ku-band radar system sub receiver exciter and antenna pod assemblies by employing risk mitigation strategies to reduce delays in scheduled deliveries of low-rate initial production ("LRIP") by tracking the line replacement component ("LRC") from kitting, assembly, testing, and final inspection.

14. In 2017, Mr. Harris was rated as "Met Expectations" in his performance review, which further demonstrated that Mr. Harris consistently met or exceeded work performance expectations and had no work performance-related issues.

15. In 2018, Mr. Harris' performance evaluation was "Met Expectations", further evidence that Mr. Harris consistently met or exceeded work performance expectations and had no work performance-related issues.

16. In May 2019, Mr. Harris worked as the Tactical Missile Digital Subsystem IPT Lead. In this position, Mr. Harris led a multifunctional engineering team to design, integrate, and test RF and digital electronic for an Electronic Warfare System. Mr. Harris managed the flow of product development to ensure cost, schedule, and technical performance were being met according to contract. Mr. Harris stayed in this position until June 2020.

17. In 2019, Mr. Harris' performance evaluation indicated that he was a "Successful Performer." Mr. Harris, however, received just a 2% salary increase which was the lowest increase Mr. Harris received in the five years he worked with Northrop Grumman. As a result, Mr. Harris was paid less than his white Caucasians colleagues. Mr. Eason was Mr. Harris' manager during

this time. From the highest to the lowest, Northrop Grumman rated and defined performance levels as follows:

i) Top Performer (in top 10% of all performers),

ii) Excellent (exceeds 60% of other performers)

iii) Successful Performer (consistently achieves requirements of position and exemplifies leadership characteristics), and

iv) Inconsistent Performer (inconsistent performance or behavior).

18. A raise of only 2% or 2.5% was considered low for a "Successful Performer". This percentage is given or seen at an "Inconsistent Performer" level and otherwise normal successful performer ranges salary increase range from 3% - 4.5%. As a result, Mr. Harris was paid less than his white colleagues.

19. In 2019, Mr. Harris received an offer to work as a manager for Northrop Grumman's Joint Counter Radio-Controlled Improvised Explosive Device Electronic Warfare ("JCREW") program in San Diego, California. Mr. Harris was making $138,000.00 in Baltimore, Maryland at this time and Northrop Grumman offered Mr. Harris only $144,000.00 to relocate and work in San Diego, California. A $6,000.00 increase to move from Baltimore to San Diego did not indicate that Northrop Grumman was serious about hiring Mr. Harris. In fact, this low offer accomplished the Northrop Grumman's intention to deter Mr. Harris from taking this job.

20. In 2019, while under Mr. Eason's management, Mr. Harris was retaliated against when he challenged the promotion process and questioned why he was allegedly not eligible for a promotion. At the time, Mr. Harris had been in a level 4 position for four years without a clear path of advancement. After Mr. Harris pushed to get more recognition for promotion, he was abruptly sent to work under Mr. Gills' management. The act was done to make it more difficult

for Mr. Harris to receive a promotion, as now he had to start over with a new manager who had no experience working with him.

21.     In 2020, Mr. Harris received a 2.5% salary increase although he was rated as a "Successful performer." Again, this was the second lowest increase Mr. Harris received in the five years he worked with Northrop Grumman. Mr. Gill was Mr. Harris' manager during this time.

22.     In January 2020, approximately five years into Mr. Harris' employment with Northrop Grumman as IPT Lead, it became necessary for Northrop Grumman to fill a Manager Program 2 Requisition position. The Manager Program 2 Requisition position included duties such as cultivating customer relations and intimacy; developing new business opportunities; establishing a program organization that effectively addresses customer programs; leading and direct cross functional IPT; measuring and reporting program performance; delivering presentation to customers; participating in the negotiation of contracts; establishing design concepts; creating the program Statement of Work; identifying program requirements; establishing program baselines; developing budget baselines utilizing Earned Value Management tools; identifying program resources; managing government/customer supplied property; managing suppliers to meet program objectives; adhering to all internal standards; ensuring program team understands and adheres to contract scope; developing master plans and schedules; and conducting Risk and Opportunity Management practices. Mr. Harris and a white co-worker William "Bill" Cramer who had been employed by Northrop Grumman for only seven months employment as the IPT Lead both applied for the position.  This position was a managerial level position and a promotion from the IPT Lead position held by Mr. Harris and Mr. Cramer. In the words of Northrop Grumman, the IPT Lead position "is the natural stepping stone to a Program Manager position."

23.    Tim Eggborn, a white male, was a Program Manager within Northrop Grumman. In this capacity, Mr. Eggbom made hiring decisions within his Program and had the responsibility to hire a Manager Program 2 Requisition. The Manager Program 2 Requisition position was directly under Mr. Eggbom. Both Mr. Harris and Mr. Cramer, among others interviewed for this position.

24.    Northrop Grumman selected Mr. Cramer over Mr. Harris for the Manager Program 2 Requisition position despite the clear and sharp contracts between experience and readiness for the position. Northrop Grumman randomly claimed that Mr. Cramer was more qualified for the position than Mr. Harris and later, in a failed attempt to justify its decision before the U.S. Equal Employment Opportunity Commission ("EEOC"), claimed that Mr. Cramer "interviewed better". These claims were not supported by facts or evidence and to justify its underlying raced-based selection of Mr. Cramer, Northrop Grumman stated in its EEOC position statement as follows:

> "In June 2019, Mr. Cramer was hired as Integrated Program Teams ('IPT') Lead for the program for which the Program Manager 2 was being hired. Thus, Mr. Cramer has been on the program for 7 months and was already embedded with the program and team. While he served as the IPT Lead, Mr. Cramer was essentially running the day to day of the key subsystem on the program. His manager, Steven Eason, felt Mr. Cramer was doing 'an outstanding job' in his position and program feedback by the end of 2019 was that he 'regularly contributes to the program in areas beyond the scope of his IPT.' Mr. Cramer also possessed a technical background which would he used daily to inform programmatic decisions on a timely basis. Based on Mr. Cramer's current position and experience on the program as well as his interview, it was determined that he was the best candidate for the position…
>
> Mr. Cramer was clearly the most qualified as he was already performing some of the tasks of the position and was already familiar with the program and team. Further, Mr. Cramer had multiple years of experience being a control account manager and IPT Lead which is the natural stepping stone to a Program Manager position."

25.    Mr. Cramer was not more qualified for the Manager Program 2 Requisition position than Mr. Harris. Mr. Harris not only had seniority over Mr. Cramer within Northrop Grumman, Mr. Harris also had multiple years of experience doing the work of a Cost Account Manager and

IPT Lead within the structure of Northrop Grumman as a "natural stepping stone to a Program Manager position." Every IPT role or responsibility includes reporting of the cost performance and the schedule performance of every program they work on. Every IPT Lead reported to program management whether the program was on schedule or not or whether the program was spending too much money or not. Within Mr. Harris' last program, Mr. Harris ran the cost and schedule analysis of his entire program on his own without supervision and reported the monthly program cost performance and schedule performance to the program manager or the director. Mr. Harris and Mr. Cramer were both IPT Leads albeit in different programs. Both employees performed exactly the same role and functions for their different programs. Both employees were responsible for the day-to-day interfacing with other departments and employees to ensure a timely delivery of the product needs of their respective programs. Mr. Harris' annual job performance reviews were also not an issue as Mr. Harris always met or exceeded expectations. Mr. Harris regularly contributed to his program in areas beyond the scope of his IPT Lead position. For example, and as stated above, Mr. Harris routinely performed the job requirements of the Manager Program 2 Requisition position as IPT Lead. Mr. Harris received multiple job awards and recognitions for his performance.

26.     During his employment with Northrop Grumman, Mr. Harris also applied for multiple jobs internally, but he was not selected for any of the positions. Mr. Harris applied for approximately 30 positions during the five period he was employed Northrop Grumman. Some of the positions Mr. Harris applied for and was not selected include:  i) Northrop Grumman; Requisition No. 17004348; ii) Program Manager 2 - Advanced Microelectronics; Requisition No. 17009361; iii) Manager Engineering 1 position; Requisition No. 17007535; iv) Northrop Grumman Job; Requisition No. 18029007; and v) POD radar engineering program manager.

Another example includes when Mr. Harris was on the POD Radar program serving as a technical IPTL under then engineering program manager, Brad Williamson. When Mr. Williamson accepted a program manager role for the Gator Radar program, Mr. Harris was overlooked as a viable replacement for the POD Radar engineering program manager even though he applied for this position and was already familiar with POD Radar program.

27.    Dan Ross, approximately 33 years of age, was the IPTL for the Seneca program before Mr. Harris took over from him. Mr. Ross was a level 4 engineer with only approximately 10 years of experience. Mr. Harris was a level 4 engineer with approximately 20 years of experience and 45 years of age. This created a stigma with all Mr. Harris' peers and program leadership to believe that he was not as smart or as skillful as Mr. Ross.

28.    Mr. Harris was also overlooked for nominations to participate in leadership training classes whereas his white counterparts, including Mr. Ross, were nominated for specific leadership training to enhance their career and make them more marketable. Mr. Ross was nominated for the NGMS Technical Leadership Workshop training and Mr. Harris was not. Both Mr. Harris and Mr. Ross were level 4 IPTL. Mr. Ross was given an opportunity to enhance his leadership skills, but Mr. Harris was denied this same opportunity. Mr. Ross was informed about this training, but Mr. Harris' manager did not disclose this information to Mr. Harris.

29.    Mr. Harris was also not able to take paternity leave when his daughter was born. He had to work extensive hours to keep the program product delivery date on schedule. Mr. Harris was not directly denied the benefit but was indirectly denied this benefit as he was not able to take time off from work because there was no one else available to come in and do the job.

30.    When Mr. Harris discussed his difficulty being considered for a promotion with Human Resources and his managers, no actions were taken to address his concerns. As a result,

Mr. Harris considered it to be counterproductive to even discuss some of his concerns about not being considered for a promotion. Mr. Harris saw white employees in the company move up the ladder much faster than black employees. For example, Mr. Ross who had approximately only 10 years of experience as a level 4 compared to Mr. Harris' 20 years, moved up quickly. Another employee was Mr. Kramer, who having only been with Northrop Grumman less than 1 year was promoted as a program manager. Yet another employee that advanced quickly was Brad Williamson, Mr. Harris' former engineering lead on POD Radar program. Mr. Williamson moved up from a designer to engineering program manager on POD radar program to Program Manager on Gator Radar program all within a short period of time.

31.     A few of Mr. Harris' peers left the company for the same observation that blacks did not get promoted as fast as whites. For example, a black engineer, Prosper Adangwa, left Northrop Grumman's employment because he was frustrated as well. Mr. Adangwa was Mr. Harris' subordinate on the Seneca Program. He complained about how he was overlooked for promotions. Another employee and a close friend of Mr. Harris was Tony Clayton. Mr. Clayton left not because of lack of promotion but because Northrop Grumman cut back his pay and overtime while other white technicians did not have to go through that, and his boss was trying to get him fired. Another example includes that a white Caucasian Engineer and co-worker to Mr. Harris, Tim Low, was paid more than Mr. Harris during his employment, earning $124,000.000 in salary in 2009 whereas Mr. Harris earned $117,000.00 despite the fact that Mr. Harris held greater job responsibilities as a RF Microwave Engineering Design Lead than Mr. Low. Mr. Harris also earned less than similarly situated white Caucasian employees including, but not limited to, Dan Ross; Scott Underwood; and Tim Dittman.

32.     On June 19, 2020, Mr. Harris was forced to resign from his position.  He began employment in 2014 as a level 4 engineer and when Mr. Harris was forced to resign, he was still a level 4 engineer. Mr. Harris did not feel that he had a fair chance to advance in the company. This was a dead-end job for Mr. Harris and no reasonable employee in the same position as Mr. Harris' would remain in employment with Northrop Grumman under the circumstances.

33.     Mr. Harris filed two charges of discrimination before the U.S. Equal Employment Opportunity Commission ("EEOC") against Northrop Grumman regarding his claims, EEOC Nos. 531-2020-02426 and 531-2023-00651. Mr. Harris received right to sue letters for both claims and has exhausted his administrative remedies. Notable, the EEOC issued a Determination in favor of Mr. Harris, stating the following:

> "The Charging Party alleges that Respondent discriminated against him because of race (African American) when he was not selected for a promotion in 2020. Charging Party further alleges that he was constructively discharged because of its discriminatory actions against him. Respondent denies that it discriminated against Charging Party.
>
> The record reveals that Respondent hired Charging Party on November 17, 2014. Although Charging Party's job title changed from 2014 until his constructive discharge, he did not receive any promotions. The record shows that Charging Party applied for numerous promotions during this period. In January 2020, Charging Party applied for a managerial position. Although he was deemed qualified for the position and was interviewed, he was not selected. The Charging Party was better qualified than the Caucasian male selected based on work experience and tenure with Respondent. The evidence shows that Respondent created an objectively intolerable working environment for the Charging Party because of his race which caused him to resign.
>
> Based on the above, I have determined there is reasonable cause to believe that Respondent failed to promote the Charging Party to the managerial position for which he applied in January 2020 because of his race (African American). I further determine that there is reasonable cause to believe that Respondent caused the Charging Party to be constructively discharged because of his race in violation of Title VII of the Civil Rights Act of 1964, as amended."

## COUNT I
**Violation of Title VII of the Civil Rights Act of 1964 *as amended* ("Title VII")**
**42 U.S.C. § 2000e *et seq.***
**Race Discrimination**
**Disparate Treatment and Hostile Work Environment**

34.     Plaintiff realleges and incorporates by reference the above paragraphs as if fully stated herein.

35.     At all pertinent times, Defendant was an employer subject to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

36.     At all pertinent times, Plaintiff was an employee entitled to protection under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

37.     Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of race with respect to an employee's compensation, terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a).

38.     Defendant, in violation of Title VII of the Civil Rights Act of 1964, knowingly and intentionally engaged in unlawful discrimination against Plaintiff and subjected him to disparate treatment and a hostile work environment, based on his race, African American. Defendant subjected Plaintiff to several acts of discrimination during his employment, including but not limited to, when Mr. Harris was consistently overlooked for promotions during his employing despite his prior extensive work experience and record, and his excellent work performance where Plaintiff consistently met or exceeded expectations, and despite his multiple applications, approximately 30, for numerous internal positions and promotions. In 2019, Plaintiff received a 2% salary increase although he was rated as a "Successful performer" which and this was the lowest increase he received in the five years he worked with Defendant and when the otherwise normal "Successful Performer" salary increase ranged from 3% - 4.5% and Plaintiff was paid less

than his white coworkers; in 2019, Plaintiff challenged the promotion process and questioned his manager why he was allegedly not eligible for a promotion and was abruptly sent to work under another manager in an effort make it more difficult for Plaintiff to receive a promotion; in 2019, Plaintiff received an offer to work as a manager for a program in San Diego, California and only offered a $6,000.00 increase in salary to relocate from Baltimore to San Diego; in 2020, Plaintiff received a 2.5% salary increase although he was rated as a "Successful performer" which was the second lowest increase he received in the five years he worked with Defendant and when the otherwise normal "Successful Performer" salary increase ranged from 3% - 4.5% and was paid less than his white  coworkers; Plaintiff was paid less than his white Caucasian co-workers including but not limited to Tim Low, Dan Ross, Scott Underwood, and Tim Dittman; in January 2020, Mr. Harris applied for a managerial position and although he was deemed qualified for the position and was interviewed, he was not selected but was better qualified than a white male who was selected, based on work experience and tenure with Defendant; Plaintiff was also not able to take paternity leave when his daughter was born and had to work extensive hours to keep the program product delivery date on schedule; and Defendant created an objectively intolerable working environment for Plaintiff, including Defendant's actions not only against him but against several of his African American peers, which caused him to be constructively discharged from his position on June 19, 2020. For the position offered to the white male co-worker Bill Cramer, Plaintiff was substantially better qualified by experience, training and documented performance. Defendant did not follow the normal selection process by promoting an employee who had only been with the company for seven months and had not received an annual evaluation in his position, and based the decision on a solely subjective, and impermissible factor, the claim that Cramer interviewed better.

14

39. As a direct and proximate result of the Defendant's actions, Plaintiff has suffered emotional distress and pain and suffering.

40. Defendant had no legitimate business reason for any such acts.

41. Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

**COUNT II**
**Violation of the Civil Rights Act of 1866**
**42 U.S.C. § 1981**
**Race Discrimination**
**Disparate Treatment and Hostile Work Environment**

42. Plaintiff realleges and incorporates by reference the above paragraphs as if fully stated herein.

42. At all pertinent times, Defendant was an employer within the meaning of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

43. At all pertinent times, Plaintiff was an employee within the meaning of and entitled to protection under the Civil Rights Act of 1866, 42 U.S.C. § 1981.

44. The Civil Rights Act of 1866, 42 U.S.C. § 1981, provides that all persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts as enjoyed by white citizens and prohibits an employer from discriminating against any individual with respect to the individual's compensation, terms, conditions or privileges of employment because of such individual's race, ancestry, or ethnicity. Section 1981 forbids all racial discrimination in the making of private as well as public contracts.

45. Defendant, in violation of 42 U.S.C. § 1981, knowingly and intentionally engaged in unlawful discrimination against Plaintiff and subjected him to disparate treatment and a hostile

work environment, based on his race, African American.  Defendant subjected Plaintiff to several acts of discrimination during his employment, including but not limited to, when Mr. Harris was consistently overlooked for promotions during his employing despite his prior extensive work experience and record, and his excellent work performance where Plaintiff consistently met or exceeded expectations, and despite his multiple applications, approximately 30, for numerous internal positions and promotions.   In 2019, Plaintiff received a 2% salary increase although he was rated as a "Successful performer" which and this was the lowest increase he received in the five years he worked with Defendant and when the otherwise normal "Successful Performer" salary increase ranged from 3% - 4.5% and Plaintiff was paid less than his white coworkers; in 2019, Plaintiff challenged the promotion process and questioned his manager why he was allegedly not eligible for a promotion and was abruptly sent to work under another manager in an effort make it more difficult for Plaintiff to receive a promotion; in 2019, Plaintiff received an offer to work as a manager for a program in San Diego, California and only offered a $6,000.00 increase in salary to relocate from Baltimore to San Diego; in 2020, Plaintiff received a 2.5% salary increase although he was rated as a "Successful performer" which was the second lowest increase he received in the five years he worked with Defendant and when the otherwise normal "Successful Performer" salary increase ranged from 3% - 4.5% and was paid less than his white  coworkers; Plaintiff was paid less than his white Caucasian co-workers including but not limited to Tim Low, Dan Ross, Scott Underwood, and Tim Dittman; in January 2020, Mr. Harris applied for a managerial position and although he was deemed qualified for the position and was interviewed, he was not selected but was better qualified than a white male who was selected, based on work experience and tenure with Defendant; Plaintiff was also not able to take paternity leave when his daughter was born and had to work extensive hours to keep the program product delivery date on

16

schedule; and Defendant created an objectively intolerable working environment for Plaintiff, including Defendant's actions not only against him but against several of his African American peers, which caused him to be constructively discharged from his position on June 19, 2020. For the position offered to the white male co-worker Bill Cramer, Plaintiff was substantially better qualified by experience, training and documented performance. Defendant did not follow the normal selection process by promoting an employee who had only been with the company for seven months and had not received an annual evaluation in his position, and based the decision on a solely subjective, and impermissible factor, the claim that Cramer interviewed better.

46.     As a direct and proximate result of the Defendant's actions, Plaintiff has suffered emotional distress and pain and suffering.

47.     Defendant had no legitimate business reason for any such acts.

48.     Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

## PRAYER FOR RELIEF

49.     WHEREFORE, Plaintiff Harris prays as follows:

A.     That the Court issue an Order declaring Defendant's actions to be a violation of Title VII of the Civil Rights Act of 1964 as amended ("Title VII"), 42 U.S.C. § 2000e *et seq*. and the Civil Rights Act of 1866, 42 U.S.C. § 1981, and declaring Plaintiff eligible to receive equitable and other relief;

B.     Enter judgment against Defendant;

C.     Issue a permanent injunction prohibiting Defendant from engaging in any discriminatory terminations and retaliation;

D. Enter judgment in favor of Plaintiff against Defendant for all equitable monetary damages available under the law, including but not limited to back pay and front pay in amount to be determined at trial and all bonuses to which Plaintiff is entitled;

E. Order Defendant to refrain from any retaliation against Plaintiff, or any other person, for participating in or supporting this case in any manner;

F. Order Defendant to pay compensatory and punitive damages in an amount no less than five million dollars.

G. Order Defendant to pay Plaintiff's reasonable attorney's fees, expert fees, and costs;

H. Order Defendant to pay pre-judgment and post-judgment interest as provided by law.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all claims against Defendant.

Date: March 9, 2023                                    Respectfully submitted,

_____*/s/ David A. Branch*_____
David A. Branch, Esq.
Bar No. 22862
Law Office of David A. Branch &
Associates, PLLC
1828 L Street N.W., Suite 820,
Washington, D.C. 20006
Phone: (202) 785-2805
Fax: (202) 785 – 0289
Email: davidbranch@dbranchlaw.com